# Pennsylvania Railroad Company *versus* The Commonwealth.

1. A clause in the charter of a railroad company, providing that all tonnage of whatsoever kind or description, except the ordinary baggage of passengers, carried or conveyed on said railroad, in each and every year, shall be subject to a toll or duty for the use of the commonwealth, of three mills per ton per mile, is simply a mode of taxing the company according to the magnitude of its business, and is not intended as a tax on commerce.

2. Such a tax is not in violation of the provisions of the Constitution of the United States, that " Congress shall have exclusive power to regulate commerce with foreign nations, and among the States," and prohibiting the

States, without the consent of Congress, from laying duties on imports and exports.

3. The acceptance by the company of a charter with such a provision is equivalent to an express contract to pay the tax. Treated as a contract, therefore, between the State and the corporation, it is not to be tested by the Constitution as a law of the State; regarded as a law, the company cannot complain of it, for they freely subjected themselves to it, for the sake of the benefits offered with it.

ERROR to the Common Pleas of *Dauphin County.*

Opinion by

LOWRIE, C. J.—Though this charter does say that all tonnage carried on this railroad shall be subject to a toll or duty of three mills per ton per mile, yet it is quite apparent that this is not intended as a means of taxing commerce or the goods carried, but simply as a mode of taxing the company according to the magnitude of its business. We say this is apparent, because the State is not to look to the goods carried or their owners for the tax, but only to the company, so as to measure a portion of its taxes by the amount of a particular portion of its business. The charter is intended to regulate the relation of the company with the State, and not those of other persons. It is, therefore, the company that is subject to "the tax on tonnage," as it is called in the supplementary act, and their acceptance of this charter with this provision in it is equivalent to an express contract to pay it to the State.

Now they seek to evade this law or contract by setting up the defence that it violates the Constitution of the United States, and is therefore void. Is it so? If this question is to be answered in the affirmative it must be done on some original principle that has as yet received no practical application: for no case has been cited, and we know of none, in which such a rule of law, or any closely analogous one, has been announced.

It is argued that the authority to impose such a tax is excluded by some one or more of three rules of the Constitution giving to Congress the exclusive power to regulate commerce with foreign nations and among the States (Art. 1, sec. 8–3), and prohibiting the States without the consent of Congress from laying duties on imports or exports (Art. 1, sec. 10–2), or any "duty of tonnage" (Art. 1, sec. 10–2). Let us briefly notice each of these. How can the exclusive power of Congress to regulate commerce be understood as forbidding this tax?

No such latitudinarianism of interpretation has ever yet been applied to this clause. Making roads is a mode of regulating commerce, by giving it facilities and direction; but no one has ever been taught that this clause excludes the States from making their own roads, and their own laws to govern the use of them, or from imposing road-taxes in their own form for

travel upon them, even a tax that may afford an income beyond the expense of construction and repairs. A State may injure itself or its citizens by bad regulations of this sort; but that does not disprove its authority to act, and it is not probable that the general government would perform the duty any better' than the States do. (See 18 Conn. R. 500; 32 Maine, 343; 14 How. U. S. 568.)

If we take *exclusiveness* as one of the tests of the power of Congress to regulate commerce, then it becomes very limited; for commerce, in its very nature, is regulated much more by natural causes, and by civilization and its wants, and by the skill and customs of those engaged in it, than it can be by any possible legislation. Our mountains, lakes, rivers, and climates, and the winds and ocean currents, and the kind of motive power, and the skill in ship-building, and our railroads, and the energy and progress of our citizens, and the common law or customs, national and international, State and interstate, of trade, have much more regulating power than it is possible for Congress to exercise. It cannot exclude any of these from their legitimate influences in the regulation of commerce; and some of these causes, as well human as natural, are very direct in their operation. The man who builds a ship that is fleeter and safer than common, affects in some measure the regulations of commerce, and yet he may fix his own terms for the use of it; and surely a State may improve its own domains and thoroughfares as it chooses, and impose its own terms in the common use of these! Terms that would prevent the use of them would almost be equivalent to not opening to public use. Even the rule of comity is not broken if there be no selfish discrimination. It is much more a regulation· of commerce that the company's own rates of charge are limited, so as not to exceed a given amount per ton per mile. And if in this, or in levying the tax, there were any discrimination in favor of our own citizens, to the prejudice of general commerce, we might consider at least some appearance of a violation of another clause of the Constitution (Article 4, sec. 2–1), assuring equality of privileges and immunities to all citizens.

But such is not the case in either form or effect, for no distinction is made in the charter between goods carried for our own citizens and for others; and it is well known that .this company habitually discriminates largely against our own citizens, so that it carries goods for others often for less than half the charges made within the State.

What we have before said shows that no duty is imposed on goods at all, and of course none on imports or exports. It is so plainly not a duty of this sort, that we must acknowledge

[Smiley v. Bowman.]

that we have not skill enough to frame an argument that can make it plainer.

Now, is it a "duty of tonnage?" (Hickey's Constitution.) This means simply that sort of duty that at the date of the Constitution was called "tonnage," and that was a duty on ships, or their cargoes, imported or exported, measured by their capacity or weight. And this was the original meaning of the word. It is not, therefore, in its strict and original sense that the word "tonnage" is used in the charter acts, but only in an analogous and derivative one.

The duty—tonnage tax—on the business of this road is not the "duty of tonnage" on naval commerce that the Constitution forbids the State to impose!

But how can the defendants allege this as a vice in their charter? If it affects none but themselves and the State, it is no vice, but a legitimate condition of the corporate franchise freely imposed and accepted. Call it a contract between the State and the Corporation, and then it is not to be tested by the Constitution as a law of the State. Call it a law, and the defendants cannot complain of it, for they freely subjected themselves to it for the sake of the benefits offered with it.

They could not accept the law by parts, approving the sections which offered them privileges, and vetoing those which imposed burdens. The grant of the privileges was on condition of their attendant burdens, and common honesty forbids the company now, when they have the privileges, to refuse the consideration of them. This class of laws is usually treated as contracts; and, regarded in this respect, of course they are not forbidden by the Constitution, for it forbids only laws which involve no individual consent as necessary to their existence; and regarded thus, this defence is merely a means of escaping from a plain contract duty.

The defence cannot succeed by covering its selfishness with the garb of patriotism, for the defendants must stand on their own rights, and not on the rights of the public. If others are injured by this tax, let them be the suitors for redress. There is no pretence that the charter requires any discrimination in favor of our own citizens; it is very unfortunately framed if it allows any against us.

Judgment affirmed, and record remitted.

READ, J., dissented.